Argued and submitted April 14, reversed and remanded for further proceedings
July 9, 1997

In the Matter of the Compensation of
Marlie D. Bruce, Claimant.

Marlie D. BRUCE,
*Petitioner,*

*v.*

SAIF CORPORATION
and FJF Logging, Inc.,
*Respondents.*

(93-07131; CA A93094)

942 P2d 789

Kevin Keaney argued the cause for petitioner. With him on the brief was Pozzi Wilson Atchison.

Michael O. Whitty, Appellate Counsel, argued the cause and filed the brief for respondents.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Claimant petitions for review of the Workers' Compensation Board's order on review, in which the Board found that claimant was not entitled to benefits for permanent total disability. ORS 656.206. We reverse and remand.

Claimant is a 42-year-old log truck driver, who has worked as a truck driver since he was 17 years old.[1] On May 23, 1988, while claimant was driving a log truck for his employer, FJF Logging, Inc., the truck rolled off a cliff. Claimant suffered facial injuries, a closed head injury, as well as injuries to his upper and lower back, right knee, and right arm, and partial loss of his vision.

As a result of his closed head injury, claimant now suffers from post-traumatic stress syndrome, depression, severe memory loss, and cognitive defects. These conditions have left him unable to return to his prior work activities. A vocational counselor identified claimant's post-injury transferable job skills as the ability to: (1) work in short cycle repetitive tasks; (2) work with things in a routine manner in a nonsocial environment; and (3) work with machines. The counselor concluded that there were some potential jobs that claimant could perform but found that, when he searched claimant's geographical area, Baker City, for such jobs, none was available.

Claimant was awarded, *inter alia*, 88 percent unscheduled disability[2] by a determination order. An order on reconsideration decreased the unscheduled disability award to 86 percent. Claimant appealed the order on reconsideration to an administrative law judge (ALJ), who concluded that claimant's injury had left him permanently and totally disabled. ORS 656.206(1)(a).[3] SAIF appealed the

---

[1] Claimant's formal education ended in the ninth grade. He has no high school diploma or general equivalency diploma (GED).

[2] Unscheduled disability is based on loss of earning capacity, determined by reference to such considerations as the claimant's age, education, and ability to adapt from his former work capabilities to his post-injury work capabilities. *See* ORS 656.214(5) and ORS 656.726(3)(f).

[3] ORS 656.206(1)(a) provides:

"Notwithstanding ORS 656.225, 'permanent total disability' means the loss, including preexisting disability, of the use or function of any scheduled or

ALJ's order to the Board, and the Board reversed the ALJ's order, concluding that claimant had not proven that he was permanently and totally disabled. Consequently, the Board reinstated the award of 86 percent unscheduled permanent disability.

■ On review, claimant raises two assignments of error. He first challenges the Board's conclusion that he is capable of performing work in the light range.[4] He argues that the Board erred in disregarding the testimony of one of his vocational expert witnesses, Huckfeldt, who rendered the opinion that claimant was limited to work in the sedentary range.[5] The Board disregarded Huckfeldt's opinion:

> "The record does not support Huckfeldt's belief that claimant is limited to sedentary work. Instead, the record supports the conclusion that claimant can perform work in the light category. Because Mr. Huckfeldt's opinion is based on an incorrect belief that claimant was limited to sedentary work, we are not persuaded by his opinion regarding claimant's employability." (Exhibit numbers and footnote omitted.)

Substantial evidence supported the Board's determination that claimant could perform light work and its consequent rejection of Huckfeldt's opinion. ORS 183.482(8)(c). Accordingly, there was no error.

■ Claimant's second assignment of error challenges the Board's rejection of the testimony of his other vocational expert witness, Ross. Ross rendered an opinion that claimant was permanently and totally disabled, based on the "odd-lot"

---

unscheduled portion of the body which permanently incapacitates the worker from regularly performing work at a gainful and suitable occupation. As used in this section, a gainful occupation is one that pays wages equal to or greater than the state mandated hourly minimum wage. As used in this section, a suitable occupation is one that the worker has the ability and the training or experience to perform, or an occupation that the worker is able to perform after rehabilitation."

[4] OAR 436-035-0310(3)(f) provides:

" 'Light (L)' means the worker has the ability to occasionally lift 20 pounds and can frequently lift or carry objects weighing up to ten pounds[.]"

[5] OAR 436-035-0310(3)(d) provides:

" 'Sedentary (S)' means the worker has the ability to occasionally lift or carry dockets, ledgers, small tools and other items weighing ten pounds[.]"

doctrine. In *Welch v. Banister Pipeline*, 70 Or App 699, 701, 690 P2d 1080 (1984), we explained that doctrine:

> "[U]nder [the 'odd-lot' doctrine,] a disabled person may remain capable of performing work of some kind but still be permanently disabled due to a combination of medical and non-medical disabilities, which effectively foreclose him from gainful employment. Such non-medical considerations include age, education, adaptability to non-physical labor, mental capacity and emotional condition, as well as the conditions of the labor market."

Larson describes the "odd-lot" doctrine as

> "the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps." 2 Larson, Workmen's Compensation Law, § 57.51, 10-60 (1976) (cited with approval in *Harris v. SAIF*, 292 Or 683, 695, 642 P2d 1147 (1982)).

In other words, in determining whether a person is permanently and totally disabled under the "odd-lot" doctrine, the question is whether the claimant is currently "able to sell his services on a regular basis in a hypothetically normal labor market." *Harris*, 292 Or at 695.

> In concluding that claimant was permanently and totally disabled, Ross stated:

> "I think in part it has to do with the labor market that he resides in. It is, as others describe it, tight, and that's described even in the file material that I reviewed. It's comprised primarily of mill work, logging, driving, and there's a trailer manufacturer and small retail operations. Given the lack of skills and the nature and degree of both his physical and cognitive impairments, I don't think he can find employment on a regular and sustained basis within that labor market."

The Board said of this testimony:

> "Ross based his opinion largely on the state of the labor market where claimant resides. Ross indicated that his opinion that claimant was permanently and totally disabled 'has to do with the labor market that [claimant] resides

in. It is, as others describe it, tight [* * *.]' We have previously held that where a claimant has not found work because of the competitiveness of the labor market and the more limited labor market in the area where he lives, and not because he is unable to perform work, the worker has not sustained his burden of proof to show that he is permanently and totally disabled. *Vivian F. Foltz*, 43 Van Natta 119 (1991);[6] *see also Mary J. Kamm*, 47 Van Natta 1443 (1995) (vocational opinion found unpersuasive where it was based on a lack of job openings in a claimant's geographical area rather than on whether the claimant was employable).[7]

"Because vocational expert Ross' opinion is based, in part, on the 'tight' labor market where claimant lives, and not on whether he is currently able to sell his services on a regular basis in a hypothetically normal labor market, we do not find it persuasive."

Claimant argues that the Board erred in failing to consider the chronically depressed nature of his labor market:

"The Board's rejection of Mr. Ross' opinion rests upon the idea that 'employability' should be determined abstractly and without reference to local conditions. This is absurd. This claimant cannot find work that accords with his work limitations within the geographic area in which he resides. * * *

"Consequently, under a correct interpretation of the law—one accounting for local conditions under which a disabled worker must look for and find work—claimant is 'unemployable.'"

---

[6] In *Vivian F. Foltz*, the claimant was only able to work part time, but was otherwise able to transfer all of her previous job skills as a receptionist/reservation clerk, grocery clerk, and salesperson. The claimant argued that, because she could only work part time at minimum wages, she could not find "gainful" employment. The Board disagreed, concluding that "the ability to do regular part time work precludes a status of permanent total disability."

[7] In *Mary J. Kamm*, the vocational expert found 182 potential employment opportunities, 66 of which had "no openings." The Board concluded:

"The fact that over one-third of claimant's potential employers lacked openings, does not mean that claimant would not be competitive for an open position. Thus, counselor Nelson's implicit reasoning that claimant is not employable (*i.e.*, able to regularly sell her services) because she has not found a job, is unpersuasive."

As support for that argument, claimant asserts that, under OAR 436-030-0055, the Board *must* consider the type of labor market in which the claimant lives. OAR 436-030-0055 provides, in part:

"(1) A worker is permanently and totally disabled if permanently incapacitated from regularly performing work in a suitable and gainful occupation. For the purpose of this rule:

"* * * * *

"(b) 'Suitable occupation' means those occupations that exist in a theoretically normal labor market, *within a reasonable geographic distance*, for which a worker has the training or experience, and abilities to realistically perform the job duties, with or without rehabilitation.

"* * * * *

"(e) A 'reasonable geographic distance' as used in this rule means either of the following unless the worker is medically precluded from commuting:

"(A) The area within a 60-mile radius of claimant's place of residence at the time of:

"(i) the original injury; or

"(ii) claimant's last gainful employment[.]

"* * * * *

"(g) 'Theoretically normal labor market' as used in OAR 436-030-0055 and 436-030-0065 means a labor market that is undistorted by such factors as local business booms and slumps or extremes of the normal cycle of economic activity or technology trends in the long-term labor market." (Emphasis supplied.)

■ As we understand OAR 436-030-0055, and particularly subsection (1)(g), that regulation requires a determination of whether, assuming "normal" conditions in the pertinent labor market (*i.e.*, within a 60-mile radius of claimant's residence), work that plaintiff could perform would ordinarily be available. Thus, cyclical "boom or bust" conditions are immaterial to the inquiry. If, however, ordinarily there is a lack of suitable work in the claimant's labor market, either because of chronically depressed conditions or a generic lack of available suitable positions, that "tight" state is material to

the "odd-lot" analysis prescribed by OAR 436-030-0055. Any broader reading of subsection (1)(g) would transform the "odd-lot" inquiry into a sterile, clinical exercise, unanchored to any actual labor market, and would effectively read subsection (1)(b) out of the regulation.

The difficulty here, however, is two-fold. First, Ross' reference to the "tight" market is ambiguous in that it could be reasonably understood to refer either to a cyclical condition or to an ordinary state. Second, it is impossible to determine from the Board's opinion how *it* understood Ross' "tight" market reference.

If the Board understood that reference to be to a periodic lack of suitable positions in the market, it properly rejected Ross' testimony. If, however, the Board (1) understood that reference to be to the state of the labor market in Baker City and the surrounding areas, which rendered suitable work normally unavailable, but (2) nevertheless rejected Ross' testimony because it did not address some abstract labor market that bore no relationship to normal conditions in the pertinent labor market, the Board erred.

■      Because we cannot tell if the Board applied the correct legal principle, we remand to the Board to clarify and, if necessary, to revise its conclusions. *See Tilden v. Board of Chiropractic Examiners*, 135 Or App 276, 282, 898 P2d 219 (1995) ("Without an adequate explanation by the Board as to its reasoning, we conclude that a meaningful review * * * is impossible.").

Reversed and remanded for further proceedings not inconsistent with this opinion.